## MYERS *v.* STATE.

Opinion delivered February 16, 1914.

1. TRIAL—MISCONDUCT OF JURORS—USE OF INTOXICATING LIQUOR DURING TRIAL.—Where the jury in a criminal prosecution are shown by uncontradicted evidence to have drunk whiskey during the progress

of the trial, so as to render all of the jurors who partook of it incapable of that calm dispassionate and impartial consideration of the case, which the law demands, it is error for the trial court to refuse to set the verdict aside and grant a new trial. (Page 412.)

2. NEW TRIAL—RAPE—NEWLY DISCOVERED EVIDENCE.—Where defendant was convicted of rape upon testimony of the prosecutrix and others, and a conviction could not properly be had without the testimony of the prosecutrix, and after conviction the prosecutrix made an affidavit retracting her testimony, a new trial should be granted upon the ground of newly discovered evidence. (Page 415.)

Appeal from Poinsett Circuit Court; *W. J. Driver,* Judge; reversed.

### STATEMENT BY THE COURT.

Appellant was convicted at the September, 1913, term of the Poinsett Circuit Court of the crime of rape, under an indictment which charged him with that crime and also with the crime of carnal abuse.

The prosecutrix testified on the trial in part as follows: "I am eleven years old; live with my father, Alonzo Johns, and Jeff McCracken and his wife, who is my sister. They have two children, Jessie, who is three years old, and Woodrow, the baby a year old. I was at home July 18; returned from school about 4:30. When I first saw Myers he was in the field sowing peas west of the house. He came to the house to get a drink at the pump, east or southeast of the house. I was washing the baby's clothes, and Theresa, my sister, was churning when he came. I soon finished washing and sat down and talked with my sister in the yard east of the house. Myers stood there talking to sister. Sister went for some potatoes, out east of the barn, and Myers said he was going in the house to play the graphophone. Jessie (the little girl) went with sister. I had Woodrow in my lap while sitting down in the yard. Myers went in the house to play the graphophone. I sat in a chair in the middle of the floor and had the baby in my lap. Myers wanted me to find a record, "They Always Pick On Me," for him. I found it. The record box was on the bed in the northeast corner of

the house. I nursed the baby with one hand and found the record with the other. Then Myers played it and I went back to the chair and sat down. He went to the south door in the kitchen, and looked out and then came to the front door and I started out and he caught me. I started out at the north door. Myers caught me around the waist and put me on the bed in the northeast corner. I still had the baby in my arms. He unbuttoned his pants. Was lying down on top of me. He pulled my clothes up and hurt me. I didn't say anything to him at all while he was on top of me; I was afraid to. I commenced to halloo and call my sister and he said if I didn't hush he would kill me. He said he would come to the corner of the schoolhouse ground and kill me. The graphophone was playing. He didn't say anything to me. He got up and went out at the south door, down through the field. I just stood there and cried. After he went away I went out in the potato patch and told sister. I was bleeding then. I had the baby in my arms and carried him to the potato patch. Sister asked me what was the matter. We went back to the house. She put me in bed, where I stayed until the next day. I could sit up then, but could hardly walk around. A doctor came that night. I was hurting when he came."

Alonzo Johns, the father of the prosecutrix, testified that her mother was dead, and that the prosecutrix was eleven years old. He lived with Jeff McCracken and his family. He was away from home on the 18th of July, the day that his daughter was said to have been raped. He made affidavit for the arrest two weeks after the alleged offense. His daughter had not told him before that time about it. He had heard the next day after the alleged occurrence that Doctor Yarborough had phoned about it and had tried to get his daughter, Malissa, to talk about it but she would not. Doctor Yarborough talked to witness about it the next day after the alleged occurrence. The day he swore out the warrant four men came out to his house, and they said that they heard that witness had been told it was done with a stick, and the

little girl had been telling it, it was Charlie Myers that hurt her. They told witness that if he would have Myers prosecuted the whole neighborhood would stand back of him, but if he let Myers go some of their own children might be raped.

Theresa McCracken testified that she was the wife of Jeff McCracken and a half-sister to Malissa Johns. Malissa was injured July 18. Myers was at their house on that day after dinner, went to the field and came back about 4 o'clock. Witness went to get some potatoes, and at that time Malissa was sitting in the house nursing the baby and Myers was playing the graphophone. The potato patch was about 125 or 130 yards from the house. Witness was gone about twenty minutes. Before she came back to the house she saw Myers go through the pasture out toward his pea field. After he left it was about five minutes before Malissa came to the potato patch. Her dress skirt was bloody. She was carrying the baby. Her eyes were kind of red like she had been crying. Witness took her to the house, changed her clothes and put her in the bed in the southeast corner of the house. The bed in the northeast corner was tumbled up a little bit. Malissa had on just one skirt. The blood spot extended to the bottom of the skirt and was about eight inches wide. Malissa didn't have on anything except a skirt. She had not arrived at the age of puberty. After the occurrence Myers was the first person witness saw. He was in the field, coming up toward the house, not far away. He got over the fence and came up the road to the gate. Witness asked him about sending for a doctor. He replied maybe she would get all right and would not need a doctor, and that if she needed a doctor he would try to get one. They saw Mrs. Smith coming up then, and Myers said if he were witness he would not say anything about Malissa getting hurt. It was about a week and a half after Malissa was hurt before she told of how she received her injuries. She stated that she had been hurt on a cane. Witness asked her if she was sure it was a cane and she said it was, and

explained that she stepped on it and the cane flew up and hit her.

When witness came back from the potato patch she saw the cane in the yard east of the house. It was about the size of witness's finger and about three and a half feet long, maybe longer. There was nothing on the cane at all. Myers lived about three-quarters of a mile from witness's house. Johns phoned for the doctor from Myers's house. The doctor came a little after dark that night. He made an examination of Malissa. Mrs. Smith and Mrs. Myers helped him. Johns, her father, was not in the room. The doctor came back the next morning and examined her again. He did not come back any more.

The doctor testified that he examined the prosecutrix on the night of the day she was alleged to have been raped between 5 and 7 o'clock. He had to use a lamp light. The bed clothes and her underclothes were soaked with blood. He found the vagina full of clotted blood. There was a hemorrhage at that time, and a tear between the vagina and the rectum, extending between an eighth and a quarter of an inch toward the rectum. He inserted three fingers. The hymen was broken and there was none there. He could not say when it had been broken, but there had been some penetration by a blunt instrument. He could insert his fingers four or five inches, and more than that could not be done in a normal woman. The prosecutrix was not suffering any pain until witness went to examine her. He examined the cane that was out on the porch; the little end was about the size of a man's little finger and the other end about the size of a man's thumb. It was four or five feet long. The large end was trimmed off round. He saw no blood on the cane. The odor when witness examined the prosecutrix was that of fresh blood and not that peculiar to menstruation.

Several witnesses on behalf of the appellant testified that they were at the house of McCracken, where the prosecutrix lived, on the day following the alleged occur-

rence and on the second day thereafter. They observed that the prosecutrix was playing around the house in the usual way and that she brought a full bucket of water out on the porch for certain of the witnesses to drink. She walked about, got up and down, and brought the water, and they observed nothing unusual about her. They observed no trouble or anything the matter with her. One witness testified that he was at the house on the next day after she was injured, in company with another person; that they took dinner at the McCracken home; that Malissa ate dinner at the table with them. They stayed from about 11 o'clock until about 3 o'clock, and Malissa, during the time while she was not at dinner, was playing about the house "just like a kid would do" with the other children. She also pumped a bucket of water. This witness stated that Mrs. McCracken on that day told witness that Malissa, after some hesitation, had told her (Mrs. McCracken) just after the occurrence what Charlie Myers had done, and that Mrs. McCracken told witness that she saw what happened. She didn't say anything about putting Malissa to bed or about any bloody clothes or any cane.

Mrs. Smith testified that she was at the home of Jeff McCracken on the evening of the day that it was reported that Malissa Johns was hurt. She was there at the same time the doctor was. Malissa was in bed when the doctor got there. Witness stayed all night there. Witness held the lamp for the doctor while he was examining Malissa. Malissa was swelled awfully bad and there was blood. Witness knew the odor of blood accompanying menstruation and that was no odor of that kind. Witness could hardly see and could not hear much. While witness was there, about night, Malissa told how she had been hurt with a cane.

Several witnesses testified that the character of the prosecutrix for truthfulness was bad, and that they would not believe her on oath.

The appellant testified that he was forty years old; he was a married man; had five children; the eldest, if

living, would be twenty-one years of age. He had lived in the neighborhood for eleven years; was a farmer, and owned the place on which he lived. Had known the Mc-Cracken family since he had been there, and Alonzo Johns. Had known the prosecutrix since she was "a little thing." He stated that he was at the McCracken home on July 18; had sowed some peas on the McCracken place on that day. The first patch was about thirty yards and the second about 100 yards from the house. His son was helping him. He was at the house three times; the first time about 2 o'clock, and he stopped there when he went to the field. Mrs. McCracken was there alone. He got some water in a bucket. When he went back later in the day Malissa and Mrs. McCracken were there at the house. The girl at that time had returned from school. He stated that he went in the house while the girl was washing or doing something at the southeast corner of the house and Mrs. McCracken was sitting at the northeast corner churning. He stated that he went in the house, saying, "I believe I will play my favorite;" that nobody went in the house with him; that Mrs. Mc-Cracken and the girl were out in the yard at that time. Afterward the girl came in, while the second record was playing, and sat in the middle of the house. Mrs. Mc-Cracken walked up to the door at that time and said she was going to dig some potatoes. The little girl went with her, and about the time Mrs. McCracken got to the south door Malissa turned and walked out of his sight. The witness then went out of the south door and down into the field and started home. When he climbed over the fence and walked up in front of the house Mrs. Mc-Cracken told witness that Malissa had hurt herself on a cane, indicating by putting her hand on the place where Malissa was hurt. Witness denied specifically that there was any conversation between himself and the prosecutrix after Mrs. McCracken left the house to go and dig the potatoes, and denied specifically that he touched the prosecutrix. He explained in detail the conversations that he had with Mrs. McCracken after the alleged occur-

rence, acknowledging that he had had some such conversation with her as she had detailed, but explained his reason for what he said. The reason he advised Mrs. McCracken not to say anything to Mrs. Smith about Malissa's injury was because Mrs. Smith was in the habit of talking "awfully hard when it was not necessary" and everybody knew it, and he didn't think that there was any use of making a public thing of it.

The above are substantially the facts upon which the jury, after receiving the instructions of the court, returned a verdict of guilty.

One of the grounds of the motion for a new trial was "that the jury during the trial were subjected to improper and illegal influences, and indulged in and used intoxicating liquors to an excessive degree, to defendant's prejudice."

It was shown that the selection of the jury began October 6, and the verdict was returned on the afternoon of the 9th. The jury had nine quarts of whiskey during the trial. One of the jurors testified that he brought a quart with him, which the jury drank, and that Warning, another juror, ordered two quarts, which they received, and they ordered six quarts while they were on the jury; they drank seven of them while they were on the case and the others after the case was over and after they had returned the verdict. He states that the jury actually drank six quarts and a pint while they were on the jury. Two of the jurors didn't drink; that the other ten did. They only took one drink at a time, one when they got up in the morning, one at dinner, one at night before supper, and one before they went to bed. If any of the jurors drank oftener than that witness did not know it. None of the jurors became intoxicated to a visible extent. The use of the whiskey, witness stated, did not have anything to do with the verdict returned so far as he was concerned. Two other jurors testified to substantially the same facts as the above.

It was shown that there were nine empty quart whiskey bottles in the room that had been occupied by the

jury. This testimony was given by the man who kept the boarding house where the jury were lodged during the progress of the trial. The witness stated that he knew the jurors drank liquor. The officer in charge of the jury was in there and witness supposed he drank also. The officer was where he could have seen the jurors drinking. Witness did not know whether the jurors had any more than the nine quarts or not. No other persons except the jurors occupied the room.

Another ground of the motion for a new trial was "that the defendant had discovered important evidence in his favor since the verdict."

On this ground of the motion the defendant prayed that time be given him at some future day to present the testimony in connection therewith. The court granted his request and adjourned until October 25, when the defendant offered affidavits.

The defendant presented the affidavit of Malissa Johns, taken before a notary public on the 15th of October, 1913, in which she stated that on July 18, 1913, she was hurt with a cane. She told her sister, Theresa McCracken, and others that she was hurt with a cane. The neighbors and others who didn't like Charlie Myers had coaxed and threatened her until they had got her to say that she was not hurt with a cane and that Charlie Myers had raped her. She stated that Charlie Myers didn't rape her, and that she didn't want to say that he did, and would never have so stated had she not been scared into saying that he did.

And another affidavit, taken on the 24th day of October, 1913, in which she stated that, in addition to the sworn statement made on the 15th of October, she wished to say that Charlie Myers not only did not commit rape on her on July 18, 1913, nor at any other time, but that Charlie Myers did not have sexual intercourse with her, nor did he ever have anything to do with her as a man with a woman, nor did he carnally know her on the 18th of July, 1913, nor at any other time, and never at any time attempted to have any intercourse with her.

She states that both these affidavits were made voluntarily and because she did not want to see an innocent man punished.

There was also presented the affidavit of Theresa McCracken, to the effect that Malissa never changed her statement about having hurt herself with a cane and never stated that Myers had raped her until the neighbors had clamored about it and said that it was Charlie Myers, and had intimidated Malissa into saying that it was Charlie Myers. The neighbors kept up this clamor for about two weeks, two or more of them coming to affiant's house every day, insisting that Malissa was not hurt with a cane and insisting that Charlie Myers should be prosecuted, and after this continuous clamor Malissa finally said that Charlie Myers raped her. Affiant knew that Malissa changed her first statement because of the continuous clamor from the neighbors that Charlie Myers be prosecuted.

An affidavit of Jeff McCracken also corroborated the statements of Theresa McCracken.

There was testimony from the attorneys representing the defendant Myers to the effect that after the verdict was returned and the motion for a new trial was filed, they had received word that Johns and McCracken and his wife were displeased with the verdict and that they didn't want the death penalty inflicted; whereupon they went to the home of the McCrackens and found that Johns and both the McCrackens were anxious that the death penalty be not enforced as against the defendant, and Johns prepared an affidavit to that effect, in which he requested that the penalty be reduced to twenty-one years in the penitentiary. And the testimony of the attorneys further showed that they were notified that McCracken and his wife and Malissa Johns wanted to make certain affidavits; whereupon the attorneys went to their home. The substance of what they wished the affidavits to contain was stated to the attorney and he reduced their statements to writing in his office and went to the home of the affiants, whereupon the affidavits, as

before set forth, were made. The attorney did not go to the home when the last affidavit of Malissa Johns was made, but he was told that she wished to make an affidavit to the effect that Charlie Myers not only did not commit rape upon her, but had never had sexual intercourse with her, whereupon he prepared a statement to that effect and his son and partner went down and Malissa Johns made the second affidavit.

It was shown by the witnesses who were present when this affidavit was taken that the prosecutrix, after the affidavit was read over to her, and after she was asked if she wanted to sign it, and was advised not to sign it if she didn't want to, replied that she wanted to sign it and did sign it.

The witness stated that there was no doubt that the parties at the time they made the affidavits previously set forth knew and understood their meaning.

The testimony of Jeff McCracken was also taken before the court, tending to show that before the prosecutrix had changed her statement to the effect that she was hurt with a cane the people in the neighborhood had called on Mr. Johns and said to him that if he didn't do something they would; they scared him and told him that if he didn't do something they were going to do something to him. He stated that Malissa was scared when these men came and she knew they were talking to her father. She acted like she was scared; shook like she had a chill. His wife also stated that she was scared all the morning. Before that Malissa had told him and his wife that there was nothing to it. After telling how she was treated at the trial, and about being placed in a cell and nearly starved to death in Memphis, and about having been locked up at the Shepherd's Home, she said that there was nothing to it. Witness asked her why she had told this story before the jury, and she said that they had her scared taking her around and she didn't know what to do.

The testimony of Johns was to the effect that certain men had come to his house and said that it was

against the law for anybody to know anything and not tell it, and they came to tell the witness, and told him that if Myers was guilty and was turned loose that their children might be raped some time. They didn't make any threats against him. He then went to the house and asked Malissa whether it was Myers that hurt her and she said that it was. He stated that if the neighbors had not come and he had not heard anything more about it that he might not have asked Malissa any more after she refused to talk to him about it. He kept on inquiring of her day by day until she got better.

Malissa Johns was then introduced and testified substantially that she was induced to change her statement first made that she hurt herself with a cane, and was induced to swear on the trial that Charlie Myers raped her because of the way the neighbors had talked and acted; and, further, that she had heard Doctor Yarborough say that she was undoubtedly not hurt with a cane, and that she thought that if she didn't accuse somebody of using force that it might be said that she was misconducting herself with some one and had got hurt that way.

On cross examination, the witness again retracted what she had said in regard to being hurt with the cane and reiterated that what she said the first time was true. She said that the reason she retracted her sworn testimony on the trial in the affidavits she made after the trial was because she didn't want to see Charlie Myers hung. Her cross examination shows that she had sworn falsely on the first trial in some particulars, but she finally concluded her cross examination as follows:

Q. Then your story the first time was partly right and partly not right? A. Yes, sir. The only thing that I swore wrong was that he went to the door.

Q. That is one thing you swore that is not so? A. Yes, sir.

The court overruled the motion for a new trial, and sentenced the defendant to be electrocuted December 31, 1913, from which judgment he duly prosecutes this appeal.

*Mardis & Mardis* and *Lamb & Caraway,* for appellant.

1. The verdict can not be sustained in this case, in view of the misconduct of the jury in drinking the astonishing quantity of intoxicating liquor shown in the record. 40 Ark. 454; 66 Ark. 545; 51 S. W. 1062; 61 Cal. 164; 44 Tex. 65-83; 20 Pac. 719; 7 Nev. 408; 36 N. E. 1108; 49 N. W. 288; 5 So. 647; 20 S. E. 1021; 22 O. St. 486.

2. A new trial should have been granted on account of newly discovered evidence. 69 Ark. 545; 91 Ark. 492-497; 96 Ark. 400; 67 Ga. 572; 60 Ga. 210; 44 Tex. 642; 98 Pac. 741; 26 S. W. 364; 94 Mo. 315; 77 Mo. 267; 2 N. E. 349; 29 N. W. 264; 131 Fed. 378; 104 Ill. 385; 3 S. W. 397; 18 S. E. 303; 58 S. W. 131; 54 Ga. 564; 2 S. W. 857; 11 S. W. 372; 10 S. W. 116; 32 So. 915.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. It appears from the evidence that none of the jurors were under the influence of liquor to such an extent that they could not give the defendant a fair trial, and there is nothing in the record to show that they were guilty of any misconduct by reason of their drinking that prejudiced appellant, or deprived him of a fair and impartial trial. 40 Ark. 454-469; 66 Ark. 545-549.

2. Courts do not, as a rule, grant new trials on newly discovered evidence that is merely cumulative, or that tends to discredit or impeach one or more witnesses of the adverse party. Even a confession of perjury on the part of the material witness does not necessarily call for a new trial, if, eliminating his evidence, there is still enough to support the judgment. 69 Ark. 545-546.

WOOD, J., (after stating the facts). 1. This court, in the case of *Dolan* v. *State,* 40 Ark. 454, passed upon the alleged misconduct of the jury in the use of intoxicating liquors as a beverage during the progress of the trial of a defendant for a capital offense. In that case it was held, after an exhaustive review of the former

cases in this court, as well as other jurisdictions, on the subject that "Where it appears from affidavit for a new trial in a criminal case that the jury drank intoxicating liquor during the trial, the circuit court should set aside their verdict of conviction, unless it further appears from the testimony that the jury were guilty of no excesses or misconduct that could have resulted prejudicially to the defendant."

Chief Justice ENGLISH, who rendered the opinion for the court, quoted liberally from the opinion of the Supreme Court of Colorado in *Jones* v. *State,* Central Law Journal, Vol. 16, No. 21, p. 409, in which the learned justice quoted from Mr. Wharton as follows: "The general rule as stated by Mr. Wharton in his work on Criminal Law, § 3111, is that the verdict will not be set aside on account of the misconduct or irregularity of the jury, even in a capital case, unless it be such as might affect their impartiality or disqualify them from the proper exercise of their functions."

Continuing, he said: "In the case at bar, it does not appear that the misconduct complained of disqualified any juror in the proper exercise of his functions in the least, or in any degree whatever impaired the correctness or justness of the verdict, but, on the contrary, the testimony to the point clearly contradicts even a presumption against the verdict.

"But it is said, on the other hand, that the only safety lies in the rigid rule of setting aside the verdict in every case where intoxicating liquors are used by the jury, regardless of whether the jury were affected by such use or not. We can not assent to this proposition. Would such a rule prevent a repetition of like misconduct by future juries? We say no. And instead of safety there is a manifest danger in the rule, for it would hold out an obvious temptation, and furnish an almost certain opportunity to secure a new trial in every case, by the surreptitious introduction of liquors into the jury room, and would tend to lessen the certainty of conviction in every criminal case."

And he concludes by saying: "Such misconduct on the part of the jury certainly deserves strong condemnation and punishment, * * * but this is a matter entirely apart from the question of setting aside the verdict when its fairness is not impeached."

We approved the doctrine in *Dolan* v. *State, supra,* in the case of *Payne* v. *State,* 66 Ark. 545-549. In the Dolan case the facts showed that ten of the jury whose misconduct was called in question made affidavits to the effect that no juror was under the influence of intoxicating drinks or subjected to any other influences whereby they, or any of them, were controlled or biased. The two jurors whose affidavits were not taken could not be found. The jurors were kept together and were attended by an officer throughout the progress of the trial, and the bailiff having them in charge testified that "from the time the jury was ordered by the court to be kept together until they returned their verdict and were discharged, there was no juror of the panel under the influence in the least degree, to be perceived by affiant, of intoxicating or other stimulants, but that all of the jurors, while on the jury, conducted themselves in all things with decorum, and were at no time exposed to improper influence whereby their verdict might be controlled or biased to the injury of defendant."

Another bailiff testified that two of the jurors in that case, whose conduct was challenged on account of the use of intoxicating liquors, took one drink and no more, and were not influenced thereby in any degree that he could perceive, and they were known to him to be sober citizens of the highest standing in the community, and that during the trial said jurors were never at any time subjected to any influence whatever prejudicial to defendant.

It thus appears that the facts which influenced the court to refuse to disturb the verdict on account of the alleged misconduct of the jury in the Dolan case were quite different from the facts in the instant case. Here only three of the jurors, out of the twelve whose conduct

was called in question, made affidavits to the effect that none of the jurors were intoxicated to a visible extent. These jurors said that, so far as they were concerned, the whiskey did not have anything to do with the verdict, and they only spoke for themselves, because they were accustomed to taking three drinks of whiskey every day. There is no testimony in the record on the part of the other jurors to show that the whiskey drunk by them did not have some effect upon them, and that it did not impair their faculties and influence them in their verdict. There was no testimony upon the part of the officers having the jury in charge to the effect that the jury indulged in the use of intoxicating liquors only to a moderate degree and that they were in no respect under the influence of same.

We are of the opinion that the use of intoxicating liquors by the jury as shown by the uncontradicted evidence in this case was so excessive as to render all who partook of it absolutely incapable of that calm, dispassionate and impartial consideration of the case which the law demands. It would be a travesty upon the administration of justice to permit a verdict to stand where the jurors rendering it are subjected to influences so calculated to impair their reason and inflame their passions and prejudices. It would be impossible for jurors who indulged in intoxicating liquors to the extent shown in this record to bring to bear upon the law and the facts in the case that discriminating and impartial judgment required in the proper exercise of their functions as jurors. It is a matter of common knowledge, that the use of whiskey continuously and in large quantities and to excess stupefies the mental faculties and impairs the reason and judgment. No one who had drunk intoxicants to the extent shown by many of the jurors in this record could pass intelligently upon the issues in any case, much less in a case where one's life hangs in the judicial balance.

For the error of the court in refusing to set aside

the verdict on account of the misconduct of the jury in this particular alone the judgment must be reversed.

2. But it was also reversible error for the court not to set aside the verdict on account of facts developed since the trial in the nature of newly discovered evidence, under the rule announced by this court in *Bussey* v. *State,* 69 Ark. 545. In that case we held (quoting syllabus): "Where defendant was convicted of rape almost entirely upon the testimony of the prosecuting witness, who after the trial made an affidavit retracting her testimony, it was error to refuse a new trial upon the ground of newly discovered evidence."

The jury would not have been warranted in convicting the defendant upon the testimony alone of the other witnesses. The testimony of the prosecutrix was essential to support the verdict. In view of the developments concerning her evidence, set forth in the statement, we are of the opinion that the appellant should have another opportunity to present his cause to jurors, who during the progress of trial and while deliberating upon their verdict, do not indulge in the excessive use of intoxicating liquors.

The cause is therefore reversed and remanded for a new trial.