## ROATH v. STATE.

Crim. 3791

Opinion delivered June 13, 1932.

*Floyd Terral,* for appellant.

*Hal L. Norwood,* Attorney General, and *Pat Mehaffy,* Assistant, for appellee.

BUTLER, J. Luther Lindsey was killed about three miles out of the city of North Little Rock between eight and nine o'clock on the evening of August 8, 1931. Clyde S. Roath, the appellant, and Mrs. Mary A. Griffin were jointly charged with his murder. A severance was granted, and the appellant placed on trial, which resulted in the conviction of the appellant and sentence to imprisonment in the State penitentiary for life.

The testimony introduced on the part of the State, independent of that of Mrs. Griffin, tended to establish the following facts: Mrs. Griffin was in the employ of Dr. Roath as an assistant in his office, and had been so employed for several years. She was a married woman, but was separated from her husband.

Mrs. Griffin had an appointment with Luther Lindsey to meet him near a school house in North Little Rock, the time for the meeting being eight o'clock, P. M. About eight thirty P. M., Mrs. Griffin was discovered a distance from North Little Rock walking on the highway in the direction of the city. Four young men who were driving an automobile, seeing her, stopped their car, and Mrs. Griffin asked to be carried back to town, explaining that she had been out driving with two men; that they had tried to "get funny," and she had gotten out of the car and started back to the city. One of the young men in the automobile noticed a purse Mrs. Griffin was carrying and testified that it appeared to be "bulging." At her request she was driven to a drug store at 5th and Main streets, about six blocks from Dr. Roath's office. She got out of the car there and left, walking in the direction of Dr. Roath's office.

A short time after Mrs. Griffin reached Dr. Roath's office and went in, Dr. Roath was seen to enter his office with his medicine case in his hand. About nine or nine-thirty P. M., Mrs. Griffin called her home, and told some one there to come to Dr. Roath's office for her. After this, Dr. Roath called Mrs. Griffin's home and said that they need not come for her—that he would bring her out himself. Dr. Roath received an emergency call

and went to attend a child who was choking. He went to the home of the child's parents in response to this call, reaching there about 9:40, and remained there some ten or fifteen minutes and, having given the child relief, left and entered his car. The child's father followed him to the porch and saw a woman sitting in the doctor's car whom he did not recognize.

Mr. Moore, the chief of police of North Little Rock, was away from his home after dinner until about eleven o'clock P. M., at which time he returned. He then learned that several telephone calls had been received at his house from some one who wanted to speak to him, but no name was given. Soon after his return and after he had received the above information, the telephone rang again, and a man's voice asked for permission to come out there. The name of the caller was not given, but just then another person spoke over the 'phone who said that she was Mrs. Griffin, and that her business with the chief was imperative. She was then given permission to come. Soon after that she arrived and entered Chief Moore's house alone, and told the chief, among other things, that Dr. Roath had brought her out there, and that he was then outside waiting in the car. She told the chief about the killing of Luther Lindsey, and, at the chief's suggestion, she was driven by Dr. Roath, first to police headquarters, and then led the way out to a highway beyond the city limits, and from thence to a point a few yards beyond what is commonly called "The Gravel Pit." There Lindsey's car was found on the side of the highway, and his dead body in the car lying forward on the driver's seat face downward. An examination of the body made soon thereafter disclosed that Lindsey had been killed by a thirty-eight calibre pistol bullet which entered the car from the rear breaking the back window and entering Lindsey's back and penetrating his heart.

A considerable number of persons, members of the police force of North Little Rock, and some officers from Little Rock had accompanied Dr. Roath and Mrs. Griffin

to the scene of the homicide. All of these were present when the dead body of Lindsey was found, and some of them began to question Mrs. Griffin in the presence of Dr. Roath. Dr. Roath appeared excited and nervous, and advised Mrs. Griffin in the presence of the officers not to tell the newspapers or the officers anything—that she could only be held for a time as a suspect, and that he would be down to see about it. This statement appears to have been made at a time when the officer had indicated that he was going to take Mrs. Griffin in charge and take her down to his office. As the officer and Mrs. Griffin were preparing to go, she extended her purse to Dr. Roath who reached for it—"snatched it," the officer said. This officer, instead of letting Dr. Roath take the purse, took it himself, but it was not shown that the purse contained anything out of the ordinary.

In addition to the above facts, about which there is little, if any, dispute, two women employed at the Mayflower Dairy which was located in the same block as Dr. Roath's office about two hundred feet away, testified that at about eight o'clock on the evening of the homicide they saw Dr. Roath and Mrs. Griffin in Dr. Roath's car passing in front of the Mayflower Dairy. A man, the superintendent of the Mayflower Dairy, was said by the two women to have been with them standing or sitting in front of the dairy when Dr. Roath and Mrs. Griffin were seen together on that evening. This man testified as to having seen Dr. Roath in his car at about the time stated by the two women, which, he said, was about ten minutes before eight o'clock. This witness, however, was not positive that Mrs. Griffin was in the car with Dr. Roath.

Mrs. Griffin was an employee of Dr. Roath, and had been working in his office for two years or longer. She acted as his office girl, bookkeeper and as nurse for such of his patients as needed her services and would accompany the doctor and assist him in all obstetrical cases. She remained on duty in his office and in the discharge of her other duties every day and frequently in the even-

ing. It was in evidence that Dr. Roath would be seen often with Mrs. Griffin in his car and would also be seen on a number of occasions going to or returning from Mrs. Griffin's home; that at least on one occasion while at her home he appeared to become impatient or angry. One witness, Ralph Mara, when asked, in connection with his testimony about Dr. Roath coming to Mrs. Griffin's while witness was there, if he had ever heard the doctor and Mrs. Griffin fussing, stated, "No, sir—the only thing I ever heard him say—he came there one night as we were getting ready to leave, he cursed and said, 'God damn, ain't you ready?'" Witness did not say what was the occasion for the doctor's impatience or to whom he was addressing his remark.

A witness Mrs. F. A. Matthews, in addition to having testified that, on a few occasions when Mrs. Griffin was visiting at her house in the evening, Dr. Roath would come there for her and take her away. She also stated that one night when Mrs. Griffin visited her she had her neck bandaged up and there was a blue place on her arm.

Another woman, Mrs. Ruby Counts, stated that she had seen blue marks on Mrs. Griffin's arm.

The above, in substance, is the evidence introduced on the part of the State, except it may be said that Lindsey's pistol was found on the car seat under his body with three chambers carrying empty shells and that there was sand on the pistol which had been seen the afternoon of the day of the homicide in Lindsey's possession, bright and clean, and with all chambers carrying loaded shells. There was further testimony on behalf of the State given by Mrs. Griffin's daughter, to the effect that her mother dined at home on the evening of the killing, and after dinner, and a short time before eight o'clock, the witness, at her mother's request, drove Mrs. Griffin to a point right near the Clendenning schoolhouse, where she got out of the car and walked to the schoolhouse.

There was additional testimony to the effect that it required ten minutes to drive a car from the gravel pit

to Mrs. Robinson's home, where Mrs. Robinson testified that Dr. Roath was, at eight-thirty, visiting her sick child.

Mrs. Griffin testified at the trial of Dr. Roath in substance to the following facts: that she had had intimate relations with Dr. Roath and with Lindsey, and that the doctor was jealous of Lindsey, and had on more than one occasion reproached her for her relations with Lindsey and did her physical violence because of Lindsey's attentions to her. She stated that she told the doctor that she was going to a picture show that night, and he told her then that if she had a date with Lindsey it would just be too damn bad, and that if she didn't stop going with him some one would be killed; that when she and Lindsey arrived at the gravel pit they saw a car standing there which resembled a Buick sedan owned and driven by Dr. Roath, and that either in the act of getting in or out of the car was a man who had on a light colored hat, shirt and trousers; that the Doctor on that day wore a panama hat and was dressed in light colored garments; that as they approached and Lindsey saw the car, he said, "Somebody has beat us here, and we will go further," so he turned his car and parked at another place. Just a few minutes after they stopped, and before they had gotten out, there was a little sound, and she looked back and saw a man standing back of the car. She screamed, "There is a man," and Lindsey reached for his pistol and the man said "Stick 'em up," and again said, "Stick 'em up, G......... d........ you," and the firing began. Lindsey "grabbed himself and says, 'They have got me' and drew several breaths and leaned over on the steering wheel and fell right over against me and I eased out from under him and stood by the car." Mrs. Griffin was badly frightened. She stood there a few minutes, and then left in the direction of the highway, and, as she passed the gravel pit, the car she had seen standing there was gone. She was unable to recognize the person who she saw at the car or the one who appeared at the back of Lindsey's car or to recognize his voice.

The defendant was not called to testify in his own behalf, but several witnesses were called for him, and testified that they were his patients and called at his office at about eight o'clock on the evening of the homicide; that the doctor was in his office examining, and administering to his patients from eight to eight thirty P. M. on that night. A Mr. and Mrs. Robinson testified that they called Dr. Roath to visit their child, and that he came at about eight-thirty o'clock; that he stayed about a half hour at their house and left just a few minutes before nine o'clock.

The case was submitted to the jury on a number of instructions to which only general objections were made, but the court failed to give, or the counsel for defendant to request, an instruction submitting to the jury the law by which they might weigh the testimony of an accomplice and telling them that a conviction could not be had on the uncorroborated testimony of an accomplice. The trial resulted in a verdict of guilty of murder in the first degree, and punishment was fixed at imprisonment in the State penitentiary for life.

Subsequent to this trial and within the time given by the court for presenting defendant's motion for a new trial, Mrs. Griffin was placed on trial for the same crime. She testified and repudiated the testimony given in the trial of Dr. Roath to the effect that he had maintained illicit relations with her, and that he was jealous of Lindsey, that he had threatened Lindsey and had struck or bruised the witness because of her associations with Lindsey. In a word, she recanted all that part of her testimony which tended to show motive on the part of Roath for the commission of the crime, explaining how her statements were induced by the officers while she was held in jail and stating that none of these statements made on the trial of Roath were true; that the only times Roath ever spoke to her about her relations with Lindsey was when he objected to her receiving Lindsey's attentions while she was in the doctor's office.

1046

In the motion for a new trial filed by the defendant a number of alleged errors were assigned, among which (1) that there was no testimony independent of that given by Mrs. Griffin tending to connect the defendant with the commission of the crime, and (2) the recantation made by Mrs. Griffin presented such a state of case as would entitle him to have the verdict of the jury set aside and that he be granted a new trial.

After a painstaking consideration of the briefs filed by counsel and a careful reading of the entire testimony contained in the transcript, we have reached the conclusion that there was no substantial evidence independent of the testimony of Mrs. Griffin to connect the defendant with the commission of the crime. Mrs. Griffin, according to the State's theory, admittedly was an accomplice indicted jointly with Dr. Roath, and, after his trial and conviction, was herself placed on trial for the murder. Therefore § 3181, Crawford & Moses' Digest, applies, which is as follows: "A conviction cannot be had in any case of felony upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the crime was committed, and the circumstances thereof. Provided that in misdemeanor cases a conviction may be had upon the testimony of an accomplice."

Counsel for the appellee have argued with great force and earnestness that all the circumstances "not only tend to connect the doctor with the commission of the crime, but without question show his guilt, and that is true without consideration being given to the testimony of Mrs. Griffin." As stated, we have not only read the abstract of the evidence in the briefs, but have examined the testimony of the witnesses in the transcript with anxious care, and we are unable to view the circumstances as does the prosecution.

What are the circumstances which counsel think so clearly indicative of guilt? Briefly re-stated, they are these: On a number of occasions Dr. Roath went to the

home of Mrs. Griffin and on others to a neighbor's house for her, and would leave with her in his car. Two of Mrs. Griffin's neighbors saw bruises on her arm. Dr. Roath was seen with Mrs. Griffin a few minutes before 8 o'clock on the night of the homicide, in his car, passing in front of the Mayflower Dairy. A few minutes after nine o'clock on this same night, Mrs. Griffin went into the office of Dr. Roath, and he followed her in a few minutes. The murder was not reported until eleven o'clock. Between the time Mrs. Griffin left the car in which the four young men brought her to the city she walked to and entered the doctor's office, and was with the doctor until the crime was reported to Chief Moore. Dr. Roath made an emergency call after 9 o'clock and before the crime was reported, and a woman was seen seated in his car in front of the house where this patient lived. At about eleven o'clock Chief Moore was called over the telephone by a man who did not give his name, seeking an interview, and, while he was talking, the telephone was taken by one who informed the chief of her identity and obtained permission from him to come to his house. Dr. Roath drove her to the home of Chief Moore and remained in the car while she went in. From there he drove her to police headquarters and from thence to the scene of the crime. While there he was nervous and, in the presence of the officers, advised Mrs. Griffin not to talk, stating that she could only be held for a time as a suspect, and that he would see about it. He attempted to take Mrs. Griffin's purse which she held out toward him, but was prevented by an officer, who took it himself. This purse was seen by the boys who picked Mrs. Griffin up, and it seemed to them to be filled or full of something.

It seems to us that these circumstances, when viewed impartially, create a mere suspicion at most as to Dr. Roath's complicity in, or perpetration of, the murder. When examined in the light of the other facts surrounding these circumstances, they appear to be consistent with his innocence. It must be remembered that Mrs.

Griffin was, and had been, in the employ of Dr. Roath for a number of years occupying a more or less confidential relationship, and her presence in the discharge of her duties was required often and frequently at night. Hence it was not out of the ordinary that he should call frequently at her house or be seen often with her in his car. There was no independent testimony as to how the bruises which were seen on Mrs. Griffin's arm were occasioned. Whether the doctor was actually seen with Mrs. Griffin in his car in front of the Mayflower Dairy at about eight o'clock on the night of the murder is extremely doubtful. The testimony of the two women by which this fact was sought to be established is in direct conflict and irreconcilable with the testimony of other witnesses who testified in behalf of the State, and the companion of the two women, the superintendent of the Mayflower Dairy, was not positive that Mrs. Griffin was in the car with Dr. Roath. However, if the fact be true, it has no significance because the Mayflower Dairy was in the same block as Dr. Roath's office, not more than two hundred feet away and several miles from the scene of the crime, which must have been perpetrated around fifteen to thirty minutes after eight o'clock. Shortly after nine o'clock, a witness, whose place of business was near the office of Dr. Roath, saw the doctor park his car about a fourth of a block from his office and get out of it with his satchel in his hand. Just a moment or two before this the witness had passed Mrs. Griffin, spoke to her and saw her go into Dr. Roath's office, and in a moment Dr. Roath came by, and he too entered the office. Within a few minutes after Mrs. Griffin and Dr. Roath met in his office at the time last mentioned, Mrs. Griffin told him of the assassination of Lindsey, at which time he showed great concern, and when asked by her what she should do he said that he must have time to think before advising. She had called her home and Roath then called it and said he would bring Mrs. Griffin home, and, after a discussion, it was decided that it would be better to give the information to the chief of police,

rather than to some one else, as he would know better what action to take than an ordinary officer. Dr. Roath attempted to get in communication with the chief at the latter's residence by telephone, but the report was that the chief was out. About that time Dr. Roath was called to attend a child who was very ill, and Mrs. Griffin, not wanting to remain alone, went with the doctor in his car and remained in the car while the doctor went in to administer to the child. They returned to the office and again attempted to communicate with Chief Moore and again were unable to find him at home. Just how many times they called the chief is uncertain, but he testified that he was informed that he had been called several times before his return home at eleven o'clock.

It is argued that because Dr. Roath permitted Mrs. Griffin to remain in his office for the time she did, go with him to visit his patient, call Chief Moore's residence without giving his name, carrying Mrs. Griffin to Chief Moore's home and remaining outside in his car, then taking her in his car to the scene of the crime together with his nervous conduct while at the scene of the crime and his frequent warnings to her not to talk, and his attempt to take her purse are all highly indicative of guilt. It seems to us however that this would be the natural conduct of a physician where a woman who had been in his employ for two or three years had suddenly appeared in his office and informed him of the tragic event of that night. It was bound to have moved him profoundly and excited his apprehension for the woman, and it was but natural for him to endeavor to advise her, and a reasonable thing that he should prefer to communicate first with Chief Moore and to wait before disclosing the crime till this could be done. He took her to the scene of the crime on the indication of the chief, and it is not remarkable that he was nervous, and that, seeing the woman alone and without friends, he should advise her not to talk. The fact that he gave her this advice in the presence of the officers to our minds indicates an honest endeavor to give her proper advice, and was not

at all an indication that he had guilty knowledge of the crime. The purse snatching is a trifling incident because the purse was taken by the officer, and, if it had contained anything unusual or which might tend to incriminate either Dr. Roath of Mrs. Griffin, certainly the officer would have given information as to its contents.

This court has recognized the rule that the corroboration of an accomplice may be sustained by circumstantial evidence, and it need not be of that degree which, of itself, would be sufficient to justify a verdict of guilty, but this evidence is not sufficient corroboration where it is equivocal or uncertain in its character. It must be such that legitimately tends to connect the defendant with the crime and of a material nature. *Hudspeth* v. *State,* 50 Ark. 534, 9 S. W. 1; *Vaughan* v. *State,* 58 Ark. 353, 24 S. W. 885; *Scott* v. *State,* 63 Ark. 310; *Cook* v. *State,* 75 Ark. 540, 87 S. W. 1176; *Celender* v. *State,* 86 Ark. 23, 109 S. W. 1024; *Earnest* v. *State,* 120 Ark. 148, 179 S. W. 174; *Strum* v. *State,* 168 Ark. 1012, 272 S. W. 359.

It will be remembered that the question of an accomplice was not presented to the jury, but it is proper for us to consider this question and the nature of the evidence sought for its corroboration, for it goes to the sufficiency of the testimony. *Redd* v. *State,* 63 Ark. 457, 40 S. W. 457.

In considering the recantation made by Mrs. Griffin of her testimony in the case at bar, it may be said that it is the better rule that the recantation of testimony of a material witness made after the trial and verdict is not sufficient to authorize the setting aside of the verdict and granting of a new trial where the verdict is justified on other testimony than that of the recanting witness, and in such cases we have consistently refused to reverse for a new trial. *Osborne* v. *State,* 96 Ark. 400, 132 S. W. 210; *Brown* v. *State,* 143 Ark. 523, 222 S. W. 377; *Little* v. *State,* 161 Ark. 245, 255 S. W. 892. However it is equally well settled in cases where the material evidence upon which a verdict is grounded,

and without which it would not have been justified, is given by a witness who subsequently repudiates this testimony, a new trial ought to be granted. *Bussey* v. *State,* 69 Ark. 545, 64 S. W. 268; *Shropshire* v. *State,* 86 Ark. 481, 111 S. W. 470; *Meyers* v. *State,* 111 Ark. 399, 163 S. W. 1177.  •

In this case, as stated, we have not found any substantial evidence other than that contained in the testimony of Mrs. Griffin which tends to establish the guilt of the accused, and because of this, even though she were not an accomplice, her recantation presents such a state of case that makes us believe that a grave injustice might be wrought by suffering the judgment based on her evidence to be sustained, and that the ends of justice would best be served by a new trial.  Reversed and remanded.