SLAYTON *v.* STATE.

Cr. 3798

Opinion delivered October 3, 1932.

*E. G. Schoonover, J. C. Ashley* and *Baker & Gautney,* for appellant.

*Hal L. Norwood,* Attorney General, and *Robert F. Smith,* Assistant, for appellee.

SMITH, J. Appellant was convicted under an indictment charging him with having been an accessory before the fact to the murder of Manley Jackson. The indictment charged Lige Dame and Earl Decker with the commission of the murder, and that appellant had advised and induced its commission.

Decker was put upon trial as a principal, and upon his conviction was given a life sentence in the penitentiary. This judgment was affirmed on the appeal to this court, and the theory of the State's case was outlined in the opinion affirming that sentence. *Decker* v. *State,* 185 Ark. 1085, 51 S. W. (2d) 521.

It was the theory of the State that both appellant and Decker had urged Dame to kill Jackson, and Dame so testified, but the only testimony to the effect that appellant and Decker had conspired with each other to this end was that of Dame, to the effect that they had each urged him to kill Jackson shortly before he did so, but Dame did not testify that either of these men was present when the other made that suggestion.

Dame testified that he killed Jackson in response to the suggestions and urgings of both appellant and Decker, made by each in the absence of the other, and through the promise of appellant to pay him a thousand dollars to kill Jackson, and through fear on his part that he would be prosecuted for arson by appellant if he did not kill Jackson.

Dame testified that he agreed with Decker to kill Jackson on a particular Saturday night, and their plan

was as follows: Jackson was the night marshal of Pocahontas and would be on duty during the night. Decker was to take Jackson into custody at about 3 A. M. and detain him at or near the public square until the arrival of Dame in an automobile, and Jackson was then to be forced into the car and carried out in the country and killed. This plan was carried into effect, and, as Dame drove away from the place where Decker had held Jackson in custody, Decker gave Dame the pistol with which he had been armed. About two miles out of town the car was stopped, and Jackson was ordered to get out, and as he did so he stated to Dame, just before he was shot by Dame, that he knew Dame was killing him on account of Dame's wife. Jackson was shot four times, and all of the shooting was done by Dame.

After the shooting both Dame and Decker were arrested and confined in the jail at Marion, but in separate cells. Dame testified that while so confined Decker wrote a note on some cigarette paper, which was passed to Dame, reading: ''I will still die before I will tell it,'' and Dame wrote on the reverse side of the paper: ''So will I,'' and passed the paper back to Decker's cell. This testimony was offered at the trial of both Decker and appellant, but the paper was not produced at either trial. This testimony was competent as against Decker upon his trial, as he was an actor in the transaction. But it was not competent evidence at the trial from which this appeal comes, and its admission against appellant constituted prejudicial error. The alleged conspiracy to kill Jackson had then been carried out. Appellant was not present when these notes were written and passed. The law is definitely settled that, where a criminal deed is done and the criminal enterprise of the conspirators is ended, the acts or declarations of one conspirator are thereafter inadmissible against his co-conspirator. The case of *Counts* v. *State,* 120 Ark. 462, 179 S. W. 662, collects and cites a number of earlier cases to this effect. The

later case of *Hammond* v. *State,* 173 Ark. 685, 293 S. W. 714, cites later cases to the same effect.

After Dame's arrest he made several conflicting statements about the killing. Two of these were made after he had been taken to the penitentiary, one oral and the other written. In both the statements made in the penitentiary Dame charged appellant with having conspired with him to kill Jackson. These confessions made in the penitentiary were admitted in evidence over appellant's objection, and we think their admission was error for the same reason that the admission of the notes written on the cigarette paper was erroneous. Nor was it competent to support the testimony of Dame given at appellant's trial by proving that Dame had previously made similar statements.

We are also of the opinion that the testimony tending to corroborate that of Dame is not sufficient to meet the requirements of the law in this respect. The leading cases in this State on the sufficiency of the corroboration of the testimony of an accomplice were cited in the recent case, *Roath* v. *State,* 185 Ark. 1039, 50 S. W. (2d) 985.

The testimony, which is recited in the brief of the Attorney General as being corroborative of that of Dame connecting appellant with the commission of the murder, is to the following effect: Dame testified that appellant was the marshal of the town of Pocahontas, and that he protected him from arrest for selling liquor, and would advise him when raids were to be made on Dame's house, where liquor was kept to be sold unlawfully. This information was conveyed by certain signals which appellant would make with his hands. It appears, however, that Dame had been frequently fined, and that he was under a penitentiary sentence for selling liquor at the time of the killing.

A former sheriff of the county testified that appellant was with him on numerous raids upon Dame's home, and that they uniformly found no liquor. In this connection, the sheriff testified as follows: "Q. Do you remember at

least on two occasions that when you suggested that you go and wait for Dame so that you could catch him with liquor that John Slayton told you the weather was bad, and that there was no use to worry getting him as somebody else would sell it anyhow? Do you remember that? A. I don't think it was that way. I said that I had heard Mr. Slayton say on one occasion (interrupted). Q. I haven't asked you what you heard, but did you ask him about laying out, and he suggested that you would take cold, and that somebody else would sell it anyhow? A. Yes, sir, I will say he did. Q. He did that once? A. Yes, sir. Q. Did he do it twice? A. I wouldn't say so. Q. Still you didn't think there was enough in that to arouse your suspicion? A. No, sir.''

The warden of the penitentiary was permitted to testify that both Dame and appellant related the same details concerning the burning of a house belonging to appellant. This house was burned some months before the killing, and Dame testified that he had burned the house to enable appellant to collect the insurance, and appellant promised him that, if he would kill Jackson, he would not only pay him a thousand dollars for doing so, but would also pay the promised reward for burning the house. Appellant admitted that he had burned a house to collect the insurance thereon, but denied that Dame had burned it.

The penitentiary warden testified that appellant said to him that he had never had any business or social relations with Dame, whereas appellant admitted at his trial that on one occasion he bought a shotgun from Dame for $5, and later bought another shotgun from Dame, the last purchase being made in a store where Dame was trying to sell or pawn the gun.

A Mrs. Meyers testified in behalf of the State that she had frequently seen appellant at Dame's home. All of these visits were not social, however, as the witness stated that on some of these occasions appellant had searched Dame's home.

A witness named Tiner testified that he had seen Dame's wife with appellant in the latter's car on more than one occasion.

The present sheriff testified that appellant had asked him to give Dame an extension of time to pay the balance due on a fine, and that he had done so. Appellant testified that he had merely communicated the request to the sheriff at Dame's instance.

An attempt was made to show that ill will existed between appellant and Jackson. This testimony was to the effect that Jackson was a prospective candidate for town marshal, the position held by appellant. Jackson had not, however, announced his candidacy.

Mrs. Maggie Taylor testified that she had frequently seen a large pistol in a holster at appellant's home, and had seen it there as late as November 4 or 5, 1931. Jackson was killed on the morning of November 8, 1931.

Deceased was killed with a .45 caliber pistol, and the father of deceased testified that on the afternoon of the day when his son had been killed appellant came to him wringing his hands and had stated that he was glad he had disposed of his .45 caliber pistol. This witness also testified that he later saw appellant, Dame and Decker talking together on a street of the town during the afternoon following the killing. Appellant expressed the opinion to deceased's father that the killing had not been committed by a resident of the community, but by some one who had stolen an automobile which was recovered on the morning of the killing about sixteen miles from the scene thereof.

The deputy prosecuting attorney testified that he was present and heard the conversation between appellant and the father of deceased, and that appellant stated the murder was an awful thing, and that he was glad he had got rid of that .45 of his, and that he had let a man named Davidson have the pistol sometime prior to that. Dame had testified that he obtained the pistol with which he killed Jackson from Decker.

There was also testimony to the effect that appellant and deceased had disagreed about the disposition of fines in certain cases in which they had been jointly interested in making the arrests, and that appellant had said to deceased that they could not work together in view of the deceased's contention, but the matter was submitted to the mayor, who took appellant's view of the matter.

There are certain other circumstances not mentioned in the brief of the Attorney General which we regard as too unimportant to mention.

There are explanations of the circumstances above detailed which we do not enlarge upon for the reason that the circumstances related do not supply that corroboration which the law requires to sustain a conviction upon the evidence of an accomplice.

We affirmed the Decker case, *supra,* upon the finding by us that the corroboration there recited was legally sufficient. That was a close case, but there were significant circumstances present there which are absent here, chief of which are these: The purchase by Decker shortly before the killing of cartridges similar to those found near Jackson's body. The fact that Decker had told of the killing before it was known in Pocahontas. Decker's remark to one Alphin that if he knew anything (about the killing) he had better keep his d—— mouth shut, and certain other statements of a similar nature.

For the lack of sufficient corroboration, and for the error in admitting the testimony as above set forth, the judgment must be reversed, and it is so ordered, and the cause will be remanded for a new trial.